**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FACEBOOK, INC., IPO SECURITIES AND DERIVATIVE LITIGATION, | MDL No. 12-2389 ECF Case |
| GAYE JONES, Derivatively on Behalf of Himself and All Others Similarly Situated, | Hon. Robert W. Sweet Case No. 13-CV-2830 (RWS) |
| Plaintiff, v. | ECF Case |
| MARK ZUCKERBERG, et al., Defendants, -and- | |
| FACEBOOK, INC., a Delaware corporation, Nominal Defendant. | |

**MEMORANDUM IN SUPPORT OF NOMINAL DEFENDANT FACEBOOK, INC.'S THRESHOLD MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.   THIS COURT SHOULD DECIDE THE COMMON JUSTICIABILITY GROUNDS FOR DISMISSAL BEFORE ADDRESSING REMAND. ...........................5

II.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS LACK STANDING AND THEIR CLAIMS ARE NOT RIPE......................................................7

   A.   Plaintiffs' Unexcused Failure To Make A Demand Requires Dismissal. ..............7

      1.   Plaintiffs Have Inadequately Alleged That A Majority Of The Directors Face A Substantial Threat Of Personal Liability. .......................8

      2.   Plaintiffs Have Not Adequately Alleged That A Majority Of The Directors Lack Independence. .................................................................12

   B.   Plaintiffs' Failure To Own Their Shares At The Time Of The Alleged Wrongdoing Requires Dismissal. .........................................................................17

   C.   The Complaints Should Be Dismissed As Unripe..................................................23

III.   PLAINTIFFS ARE INADEQUATE REPRESENTATIVES UNDER RULE 23.1. ........24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984)............................................................................ 12, 14

*Bates v. Long Island R.R.*,
  997 F.2d 1028 (2d Cir. 1993) ............................................................................ 5

*Beam v. Stewart*,
  845 A.2d 1040 (Del. 2004)............................................................................ 12, 13

*Berman v. Sugo LLC*,
  580 F. Supp. 2d 191 (S.D.N.Y. 2008) ............................................................ 21

*Chan v. Louis*,
  303 A.D.2d 151(N.Y. App. Div. 2003) ............................................................ 22

*Desimone v. Barrows*,
  924 A.2d 908 (Del. Ch. 2007)............................................................................ 8

*E. Paralyzed Veterans Ass'n, Inc. v. Lazarus-Burman Assocs.*,
  133 F. Supp. 2d 203 (E.D.N.Y. 2001).............................................................. 19

*Faber v. Metropolitan Life Ins. Co.*,
  648 F.3d 98 (2d Cir. 2011) ............................................................................ 17

*Falkenberg v. Baldwin*,
  1977 WL 1025 (S.D.N.Y. June 13, 1977)........................................................ 23

*Grobow v. Perot*,
  539 A.2d 180 (Del. 1988)
  overruled on other grounds,
  746 A.2d 244 (Del. 2000)................................................................................ 16

*Harff v. Kerkorian*,
  324 A.2d 215 (Del. Ch. 1974)
  *aff'd in relevant part, rev'd in part on other grounds*,
  347 A.2d 133 (Del. 1975)................................................................................ 20

*Helvering v. Sw. Consol. Corp.*,
  315 U.S. 194 (1942) ...................................................................................... 20

*Hutchison v. Deutsche Bank Secs. Inc.*,
   647 F.3d 479 (2d Cir. 2011) .................................................................................... 10

*In re Accuray, Inc. S'holder Derivative Litig.*,
   757 F. Supp. 2d 919 (N.D. Cal. 2010) ..................................................................... 18

*In re Bank of N.Y. Derivative Litig.*,
   320 F.3d at 293 ........................................................................................................ 19

*In re Citigroup Inc. S'holder Derivative Litig.*,
   2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009) .......................................................... 8

*In re Cray Inc.*,
   431 F. Supp. 2d 1114 (W.D. Wash. 2006) .............................................................. 23

*In re Facebook, Inc., IPO Secs. & Derivative Litig.*,
   MDL 12-2389, -- F. Supp. 2d --, 2013 WL 525158 (S.D.N.Y. Feb. 13, 2013) ................ passim

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
   2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ........................................................... 15

*In re IAC/InterActiveCorp Sec. Litig.*,
   478 F. Supp. 2d 574 (S.D.N.Y. 2007) ..................................................................... 15

*In re infoUSA, Inc. S'holders Litig.*,
   953 A.2d 963 (Del. Ch. 2007) ................................................................................... 7

*In re Integrated Resources, Inc. Real Estate Ltd. P'Ships Secs. Litig.*,
   1995 WL 234975 (S.D.N.Y. Apr. 21, 1995) .......................................................... 6, 7

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
   906 A.2d 808 (Del. Ch. 2005) ................................................................................. 15

*In re JPMorgan Chase & Co. S'holder Derivative Litig.*,
   2008 WL 4298588  (S.D.N.Y. Sept. 19, 2008) ....................................................... 24

*In re Oracle Corp. Derivative Litig.*,
   867 A.2d 904 (Del. Ch. 2004) ................................................................................. 11

*In re Prestige Brands Holding, Inc.*,
   2006 WL 2147719 (S.D.N.Y. July 10, 2006) ......................................................... 12

*In re Prudential Secs. Inc. Ltd. P'ships Litig.*,
   158 F.R.D. 562 (S.D.N.Y. 1994)............................................................................... 8

*In re Sagent Tech., Inc. Derivative Litig.*,
   278 F. Supp. 2d 1079 (N.D. Cal. 2003) ................................................................. 15

*In re United Telecomms., Inc., Secs. Litig.*,
  1993 WL 100202 (D. Kan. Mar. 4, 1993) ............................................................ 23

*Kolancian v. Snowden*,
  532 F. Supp. 2d 260 (D. Mass. 2008) .................................................................. 19

*Merck Eprova AG v. ProThera, Inc.*,
  670 F. Supp. 2d 201(S.D.N.Y. 2009) .................................................................. 25

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Georgiadis*,
  903 F.2d 109 (2d Cir. 1990) ................................................................................ 5

*Montgomery v. Aetna Plywood, Inc.*,
  231 F.3d 399 (7th Cir. 2000) .............................................................................. 20

*Myers v. Merrill Lynch & Co.*,
  1999 WL 696082 (N.D. Cal. Aug. 23, 1999),
  *aff'd*, 249 F.3d 1087 (9th Cir. 2001) .................................................................. 11

*Ogden v. Collins*,
  2010 WL 4816059 (Del. Nov. 29, 2010) .............................................................. 8

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ........................................................................................... 24

*Parfi Holding AB v. Mirror Image Internet, Inc.*,
  954 A.2d 911 (Del. Ch. 2008) ............................................................................ 22

*Parkinson v. West End St. Ry.*,
  53 N.E. 891 (Mass. 1899) .................................................................................. 20

*Pessin v. Chris-Craft Indus., Inc.*,
  586 N.Y.S.2d 584 (1992) ................................................................................... 21

*Potter v. Hughes*,
  546 F.3d 1051 (9th Cir. 2008) ...................................................................... 17, 24

*Priestley v. Comrie*,
  2007 WL 4208592 (S.D.N.Y. Nov. 27, 2007) ................................................... 25

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993) ............................................................................... 8, 15

*RCM Secs. Fund, Inc. v. Stanton*,
  928 F.2d 1318 (2d Cir. 1991) ............................................................................. 15

*Rosenblatt v. Getty Oil Co.*,
    493 A.2d 929 (Del. 1985)................................................................. 12

*Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*,
    34 A.3d 1074 (Del. 2011)........................................................... 20, 21

*SEC v. Altomare*,
    300 F. App'x 70 (2d Cir. 2008).................................................... 21

*SEC v. Universal Exp., Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007)......................................... 21

*St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*,
    2006 WL 2849783 (S.D.N.Y. Oct. 4, 2006) ............................... 25

*Sternberg v. O'Neil*,
    550 A.2d 1105 (Del. 1988)........................................................... 20

*Stroud v. Grace*,
    606 A.2d 75 (Del. 1992).............................................................. 12

*Stull v. Baker*,
    410 F. Supp. 1326 (S.D.N.Y. 1976)........................................... 25

*Tenet v. Doe*,
    544 U.S. 1 (2005) ......................................................................... 5

*Wall Street Sys., Inc. v. Lemence*,
    2005 WL 292744 (S.D.N.Y. Feb. 8, 2005) ................................ 24

*Washtenaw Cnty. Emps.' Ret. Sys. v. Princeton Review, Inc.*,
    2012 WL 727125 (D. Mass. Mar. 6, 2012) ................................ 10

*White v. Panic*,
    783 A.2d 543 (Del. 2001)............................................................. 7

**Statutes and Regulations**

15 U.S.C. § 77e .............................................................................. 21

15 U.S.C. § 77r(a)(2)(A)................................................................. 11

17 C.F.R. § 229.503(c).................................................................... 10

**Rules**

Fed. R. Civ. P. 23.1 ................................................................ passim

Fed. R. Civ. P. 23.1(a) ........................................................................... 24

Fed. R. Civ. P. 23.1(b)(1).......................................................................... 17

**Legislative Materials**

H.R. Conf. Rep. 104–864 (1996),
    *reprinted in* 1996 U.S.C.C.A.N. 3920 ..................................................... 11

Pub. L. No. 104-290, 110 Stat. 3416 (1996) ............................................. 11

## INTRODUCTION

This is the sixth shareholder derivative action arising out of Facebook's May 18, 2012 initial public offering ("IPO").   It was filed nine months after the first four were filed immediately following the IPO,[1] and a month after a fifth derivative action was filed in this Court.[2]  Like those before it, this latest derivative action alleges that the Board allowed Facebook to file a Registration Statement that did not disclose its internal revenue projections.  And like the plaintiffs in the other removed derivative actions (*Levy*, *Cole*, and *Hubuschman*), the *Jones* Plaintiffs have filed a remand motion.  This will all sound familiar—just a few months ago, after determining that threshold justiciability issues of standing and ripeness should be addressed before subject matter jurisdiction, this Court dismissed virtually identical derivative complaints because plaintiffs failed to adequately plead demand futility and continuous and contemporaneous share ownership, and because plaintiffs' claims were not ripe.  *In re Facebook, Inc., IPO Secs. & Derivative Litig.*, MDL 12-2389, -- F. Supp. 2d --, 2013 WL 525158, at *7, *26 (S.D.N.Y. Feb. 13, 2013) ("Derivative Opinion" or "Derivative Op.").  This latest Complaint suffers from the same three threshold defects, and it should be dismissed for the same reasons set forth in the Derivative Opinion.

*First*, Plaintiffs offer no new allegations suggesting that a majority of Facebook's Board of Directors is incapable of impartially considering a shareholder demand.  As with plaintiffs Childs, Levy, Cole, and Hubuschman, the *Jones* Plaintiffs "made no demand to the Board, failed to rebut the presumption that the majority of the Board was [dis]interested and have not pled

---

[1]   *See Cole v. Zuckerberg*, No. 12-cv-7549; *Hubuschman v. Zuckerberg*, No. 12-cv-7553; *Levy v. Zuckerberg*, No. 12-cv-7815; *Childs v. Zuckerberg*, No. 12-cv-4156.

[2]   *See Crocitto v. Zuckerberg*, No. 13-cv-0786.

sufficient facts demonstrating the Board's conscious inaction." Derivative Op. at *23. Plaintiffs' failure to plead demand futility merits dismissal for lack of derivative standing.

**Second**, just as with plaintiffs Childs, Levy, Cole, and Hubuschman, the *Jones* Plaintiffs have not pleaded specific facts demonstrating that they owned Facebook stock "at the time the alleged wrongful transactions took place," and they therefore "cannot establish standing for their derivative claims." Derivative Op. at *17; *see also id.* at *14 n.17. While Plaintiffs' counsel told this Court that he had "sufficient proof" that the *Jones* Plaintiffs were different from all the other derivative plaintiffs because they supposedly owned Facebook stock prior to the IPO, *see* 5/1/2013 Hr'g Tr. at 3-4, in fact, there is no such difference. Several weeks after that hearing, Plaintiffs admitted that the representations that had been made to the Court were inaccurate and that prior to the IPO, they had merely purchased units in a private investment fund that in turn held Facebook stock. *See* 5/23/2013 Letter from Sam Rudman to Andrew Clubok at 1 (Cascio Decl. Ex. A). This interest is the same type of investment interest that plaintiff Crocitto allegedly acquired prior to the IPO. *See Crocitto v. Zuckerberg* Compl., No. 13-cv-0786, Dkt. 1, ¶ 7. Thus, just like all the other derivative plaintiffs, the *Jones* Plaintiffs only became owners of Facebook stock *after* the IPO and therefore lack standing to bring a derivative action based on pre-IPO conduct.

**Third**, just as with plaintiffs Childs, Levy, Cole, and Hubuschman, the *Jones* Plaintiffs' claims are "predicated on the resolution of other litigation." Derivative Op. at *25. The *Jones* Plaintiffs have not even offered an argument to distinguish the ripeness ruling in the Derivative Opinion. Therefore, their "claims are not ripe" and must also be "dismissed on this basis." *Id.*[3]

---

[3]   Because this Court has thoroughly addressed these issues in granting Facebook's motion to dismiss the prior derivative suits, Facebook will not repeat all the arguments in support of

*Finally*, an additional threshold issue not addressed in the Court's Derivative Opinion supports dismissal. The *Jones* Plaintiffs are represented by counsel that *sued* Facebook and sought lead counsel status in the federal class action litigation before this Court, but now are trying to sue derivatively *on behalf of* Facebook. This conflict renders the *Jones* Plaintiffs inadequate representatives under Fed. R. Civ. P. 23.1.

## BACKGROUND

This Court dismissed the first four derivative suits, filed by plaintiffs Childs, Levy, Cole, and Hubuschman, in its February 13, 2013 order. Derivative Op. at *7, *26. This Court originally granted those plaintiffs leave to replead within twenty days. *Id.* at *26. The parties then entered into a stipulation, approved by the Court on March 7, 2013, which permitted those four plaintiffs to "either file an amended complaint or notify Defendants that such Plaintiff does not intend to file an amended complaint by 20 days after this Court's resolution of Defendants' forthcoming motion(s) to dismiss" the consolidated securities class action. Joint Stipulation and Order (Mar. 7, 2013) (Cascio Decl. Ex. B).

A fifth plaintiff, Robert Crocitto, filed another shareholder derivative suit in this Court on February 4, 2013, claiming that he owned an "interest[]" in Facebook shares before the IPO based on his alleged purchase of units in an investment vehicle that converted into stock "upon the IPO." *Crocitto v. Zuckerberg* Compl., No. 13-cv-0786, ¶ 7. In light of the February 13, 2013 dismissal of the Childs, Levy, Cole, and Hubuschman actions, the parties entered into a similar stipulation with Plaintiff Crocitto, deferring the filing of an amended complaint until 20 days after the resolution of the motion to dismiss the consolidated securities class action.

_____

that motion here. Nonetheless, Facebook incorporates its prior derivative motion to dismiss briefing by reference. *See* Dkt. Nos. 23-25.

Stipulation and Order (Mar. 7, 2013) (Cascio Decl. Ex. C).

Weeks after this Court issued the Derivative Opinion, Plaintiffs Gaye Jones and Holly McConnaughey, both represented by the same counsel, filed identical derivative complaints in the Delaware Court of Chancery.  On April 2, 2013, the cases were consolidated, with the *Jones* action deemed the operative complaint.  Facebook removed to the United States District Court for the District of Delaware on April 5, 2013, and the MDL panel transferred *Jones* to this Court on April 18, 2013, after Plaintiffs filed no opposition to the Conditional Transfer Order.  On April 23, 2013, Plaintiffs filed a motion to remand to the Delaware Court of Chancery.

On May 1, 2013, the Court held a status conference to discuss the briefing schedule for Plaintiffs' motion to remand and Facebook's then-forthcoming motion to dismiss.  Facebook argued that this case was no different from the other derivative actions, that Plaintiffs' alleged ownership interest was the same interest that plaintiff Crocitto alleged, *i.e.*, units in an investment fund, and that it should proceed on the same schedule.  Plaintiffs' counsel insisted this case was different and that they had documentation that Plaintiffs actually owned "Facebook stock" prior to the IPO.  Based on those representations, this Court ordered counsel to agree on a briefing schedule for "additional anticipated motions," and scheduled a hearing for the motion to remand on September 25, 2013.  *See* 5/3/2013 Order (Dkt. #96).  The Court subsequently endorsed the parties' agreement that this motion to dismiss on threshold grounds should be heard the same day.[4]  Dkt. #107.

---

[4]   The parties also agreed that Facebook and the other defendants reserve their rights to seek dismissal on grounds not addressed in this motion, if necessary.  *See* 6/4/2013 Letter from S. Rudman to Hon. Robert W. Sweet. (Cascio Decl. Ex. D).

## ARGUMENT

### I.    THIS COURT SHOULD DECIDE THE COMMON JUSTICIABILITY GROUNDS FOR DISMISSAL BEFORE ADDRESSING REMAND.

As this Court has already held, "derivative standing and ripeness are 'the sort of threshold questions that may be resolved before addressing jurisdiction,'" and, in the circumstances of this case, "procedural convenience, efficiency and judicial economy warrant consideration of the threshold dismissal issues first."  Derivative Op. at *6-7 (quoting *Tenet v. Doe*, 544 U.S. 1, 6 (2005))(internal quotations omitted).[5]  This ruling applies with even greater force to this motion. To begin with, similar justiciability issues remain before this Court in the five other derivative cases that this Court will have to address again.  The Court granted leave to plaintiffs Childs, Levy, Cole, and Hubuschman to try to amend to solve the justiciability issues of standing and ripeness.  *Id.* at *26.  Likewise, Facebook will move to dismiss the *Crocitto* complaint on

---

[5]    Plaintiffs argued at the May 1 status conference that this "case should be promptly remanded back to Delaware" because Facebook is "judicially estopped from arguing that Delaware is not the exclusive forum" for this action.  May 1, 2013 Hr'g Tr. at 4-5.  This judicial estoppel argument is without merit and provides no basis for resolving Plaintiffs' remand motion prior to the threshold justiciability issues raised herein.  Judicial estoppel applies "only if the party against whom the estoppel is claimed actually obtained a judgment as a result of the inconsistent position."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Georgiadis*, 903 F.2d 109, 114 (2d Cir. 1990); *see also Bates v. Long Island R.R.*, 997 F.2d 1028, 1038 (2d Cir. 1993).  In the first place, Facebook has not taken "inconsistent" positions in choosing not to invoke the forum selection clause in this case.  The forum clause expressly provides that Facebook may consent to jurisdiction in another forum on a case-by-case basis, *see* Derivative Op. at *3 (quoting forum selection clause), and Facebook provided that consent in removing the *Jones* case.  *See* Notice of Removal, *Jones v. Zuckerberg*, No. 1:13-cv-00548 (D. Del. Apr. 5, 2013), at ¶ 33.   Moreover, Facebook was not successful in obtaining a dismissal of the other derivative actions based on its forum selection clause argument, let alone in obtaining a "judgment as a result of" the clause.  *See Merrill Lynch*, 903 F.2d at 114. To the contrary, this Court *rejected* Facebook's argument that the forum selection clause required the derivative suits to be litigated in Delaware Chancery Court.  *See* Derivative Op. at *14 ("Defendants' motion to dismiss based on the forum selection clause and venue is ... denied.").

standing and ripeness grounds pursuant to the schedule ordered by this Court.  Thus, as before, "[a]djudicating [those five cases] while remanding [the *Jones* Plaintiffs' case] with 'common issues' would be duplicative and beget potentially conflicting rulings by this Court and the … State Court.  Avoiding this inefficiency and inconsistency further warrants the consideration of the justiciability issues before the removal issues."  *Id.* at *7.

Given this Court's Derivative Opinion, it only makes sense for this Court to be the forum for deciding whether the *Jones* case is distinguishable.  As this Court explained in *In re Integrated Resources, Inc. Real Estate Ltd. P'Ships Secs. Litig.*, 1995 WL 234975 (S.D.N.Y. Apr. 21, 1995), once an MDL Court has addressed issues in one case, there is every reason for the MDL Court to address similar issues in a subsequent case.  *Id.* at *4.  As *Integrated Resources* explained:

> a key principle of the multi-district scheme involves the accrual of judicial expertise.  It is a fundamental assumption of the multidistrict system that having only one court sort out the facts of complex and multi-faceted transactions and occurrences which have given rise to many competing legal claims well serves the goal of judicial economy. … The *Integrated* cases have indeed presented a complex set of facts and theories.  This factual context forms the backdrop, if not the very substance, of Plaintiffs' remaining claims and to remand them at this point would require another court to make its own way up this same learning curve, resulting in just that duplication of efforts that the multidistrict  system is designed to avoid.

*Id.*[6]  So too here:  it would make no sense to "require another court to make its own way up th[e] same learning curve" on the derivative standing and ripeness issues this Court has already considered and resolved.

---

[6]   Like this case, *Integrated Resources*, cited by this Court in the Derivative Op. at *7, involved a case that had been removed to federal court and transferred by the MDL Panel to this Court.  *Integrated Resources*, 1995 WL 234975, at *2.  And, like this case, the *Integrated Resources* plaintiffs argued that their new allegations made their case different from other cases within the MDL proceeding that had been dismissed by the MDL Court.  *Id.* at *5-7.

## II.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS LACK STANDING AND THEIR CLAIMS ARE NOT RIPE.

Like the four derivative complaints that this Court has already dismissed on justiciability grounds, and like the fifth derivative complaint filed by Plaintiff Crocitto, Plaintiffs' Complaint suffers from three threshold defects, each of which independently warrants dismissal.  First, Plaintiffs did not make a pre-suit demand on Facebook's Board of Directors and cannot plausibly allege that such a demand would have been futile.  Second, Plaintiffs have not sufficiently alleged that they owned shares in Facebook at the time of the alleged wrongdoing.   Third, Plaintiffs assert claims that are contingent on the outcome of other unresolved litigation, and thus are not ripe.  *See* Derivative Op. at *7, *26.  For the reasons set forth below, and the reasons set forth in this Court's Derivative Opinion, these latest derivative claims should also be dismissed.

### A.   Plaintiffs' Unexcused Failure To Make A Demand Requires Dismissal.

Where, as here, a plaintiff fails to make a demand, the plaintiff must present particularized facts showing that the board is "incapable of exercising its power and authority to pursue derivative claims directly."  *White v. Panic*, 783 A.2d 543, 551 (Del. 2001) (emphasis omitted; internal quotation omitted); *see also* Fed. R. Civ. P. 23.1.  The plaintiff may not rely on mere conclusory allegations.  *See In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007).  Moreover, where, as here, a derivative plaintiff does not challenge a specific transaction approved by the board, the plaintiff must adequately plead that a majority of the company's board of directors were incapable of objectively responding to a demand because they either (1) "face a sufficiently substantial threat of personal liability," and are thus themselves interested, or (2) "are compromised in their ability to act independently of the interested directors."  *Desimone v. Barrows*, 924 A.2d 908, 928 (Del. Ch. 2007); *see also In re Citigroup Inc. S'holder Derivative Litig.*, 2009 WL 2610746, at *3 (S.D.N.Y. Aug. 25, 2009)

(plaintiff must plausibly allege that the board of directors could not "'have properly exercised its independent and disinterested business judgment in responding to a demand'") (quoting *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)).[7]  Plaintiffs cannot make either showing here, for the reasons that this Court has already stated in holding that the other derivative complaints failed to adequately allege demand futility.

      **1.**      **Plaintiffs Have Inadequately Alleged That A Majority Of The Directors Face A Substantial Threat Of Personal Liability.**

      This Court previously held that no members of Facebook's Board face a substantial likelihood of liability because, while "the essence of the Derivative Plaintiffs' complaints is that the Board allowed Facebook to file a Registration Statement that did not disclose its internal revenue projections," courts "throughout the country have uniformly agreed that internal calculations and projections are not material facts that are require[d] to be disclosed in a registration statement."  Derivative Op. at *23 (internal quotations omitted) (collecting cases). Here, notwithstanding the Court's dismissal of the other derivative actions roughly two weeks before this suit was filed, the Complaint is likewise premised on the alleged nondisclosure in the Registration Statement of internal revenue projections.  *See, e.g.*, Compl. ¶ 99 (alleging that the Director Defendants knew "Facebook's revised revenue estimates" but "deliberately chose not to

---

[7]    Plaintiff McConnaughey has an even higher burden.  Between the filing of the *Jones* and *McConnaughey* actions, Facebook added a ninth director, Susan Desmond-Hellman, current Chancellor of the University of California, San Francisco.  Because the independence of the board is considered at the time of filing, *Rales*, 634 A.2d at 934, Plaintiff McConnaughey must show that *five* members of Facebook's nine-person board would have been unable to independently consider a shareholder demand.  The consolidation of the *Jones* and *McConnaughey* actions does not relieve Plaintiff McConnaughey of making this higher showing.  *See In re Prudential Secs. Inc. Ltd. P'ships Litig.*, 158 F.R.D. 562, 571 (S.D.N.Y. 1994) ("[C]onsolidation will have no effect on the substance of the plaintiffs' allegations[.]"); *Ogden v. Collins*, 2010 WL 4816059, at *5 (Del. Nov. 29, 2010) (same).

disclose that highly material information"); *id.* ¶ 100 (alleging that the Board knew that Facebook "had revised the Company's estimates" of revenues for the "second quarter and full year of 2012," but "chose not to disclose this material information"); *id.* ¶ 45 (claiming that the Registration Statement was "materially misleading and incomplete because it did not disclose" that "Facebook had reduced its revenue estimates"); *id.* ¶ 66 ("Pursuant to Item 3 of Form S-1, the Registration Statement was required to furnish the information [the revenue forecasts and guidance] pursuant to Item 503 of Regulation S-K [17 C.F.R. § 229.303] (sic).").[8] These flawed nondisclosure claims are the *only* claims that Plaintiffs seek to bring against five of the eight Director Defendants, a majority of the Board. These nondisclosure claims fail for the reasons the Court already stated in the Derivative Opinion and that are further explicated in the Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Class Dismissal Motion").)[9]

The only thing even arguably new is that Plaintiffs allege that the duty to disclose projections in an IPO Registration Statement is allegedly based on Item 503(c) of Regulation S-K. (Compl. ¶ 66.) The prior derivative complaints based the same alleged duty on Item 303 of

---

[8] At times, Plaintiffs seem to suggest that Facebook experienced a decline in *actual* revenue, as opposed to simply decreasing its internal *estimate* of revenue *growth*, for the second quarter of 2012, *see, e.g.*, Compl. ¶ 65 ("The decline in revenues and earnings resulting from this adverse trend was known and quantifiable at the time of the IPO."), and further that the actual second quarter revenue results *confirmed* the reduced revenue estimates, *see* Compl. ¶ 12 ("Facebook's actual revenues for the second quarter of 2012 were $1.184 billion and confirmed the reduced estimates known to Defendants prior to the IPO."). This is inaccurate. Facebook's second quarter 2012 revenue of $1.184 billion came in at the **high end** of the original $1.1 to $1.2 billion projection shared with its underwriters' analysts on April 16, 2012, rather than at the low end of that range, as it had disclosed later to the underwriters' analysts in early May 2012. *See* Compl. ¶¶ 37, 46. These actual results represented an *increase* of almost 12% over the previous quarter and a 32% *increase* from the second quarter in the previous year. *See* Facebook's Form 10-Q Disclosure, July 31, 2012, at 5, 18 (Cascio Decl. Ex. E).

[9] *See* Dkt. No. 92. Facebook adopts that filing and its exhibits by reference.

Regulation S-K.  (*Levy* Compl. ¶ 10; *Cole/Hubuschman* Opp'n to Transfer Motion, MDL No. 2389, at 20 n.18 (J.P.M.L. July 16, 2012) (Dkt. 67).)  This distinction makes no difference.  As discussed in the Class Dismissal Motion at 27-33, the SEC and the courts have consistently rejected a duty to disclose projections in an IPO under any aspect of federal securities law, including Item 303.  And courts also consistently reject attempts to base liability under Item 503(c) when there is no liability under Item 303.  *See, e.g.*, *Hutchison v. Deutsche Bank Secs. Inc.*, 647 F.3d 479, 484-85 (2d Cir. 2011); *see also Washtenaw Cnty. Emps.' Ret. Sys. v. Princeton Review, Inc.*, 2012 WL 727125, at *5 (D. Mass. Mar. 6, 2012) (dismissing claims under Items 303 and 503 because the "[f]ederal securities laws focus on the mandatory disclosure of backward-looking hard information, not forecasts").  Likewise, the very SEC 2005 release that reaffirmed that there was no duty to disclose projections in IPO offering documents also discussed Item 503(c).  70 Fed. Reg. 44722, 44739 (Aug. 3, 2005) (cited in Derivative Op. at *23).  Surely, the SEC's 2005 reaffirmation that there was no duty to disclose projections in an IPO offering document encompassed all SEC rules, including Item 503(c).  Finally, the text of Item 503(c) requires only "a *discussion* of the most significant factors that make the offering speculative or risky" and further states that "*concise*" discussion suffices.  17 C.F.R. § 229.503(c) (emphasis added).  Because Facebook's Registration Statement "repeatedly made express and extensive warnings … about the trend of increased use of mobile applications," Derivative Op. at *19, Facebook satisfied any Item 503 obligation that it might have had.[10]

---

[10]  Plaintiffs also argue that state law required disclosure of the projections "in the Registration Statement."  *E.g.*, Compl. ¶¶ 45, 66.  This Court's Derivative Opinion, at *19, held to the contrary.  Moreover, in the National Securities Markets Improvement Act of 1996 ("NSMIA") Pub. L. No. 104-290, 110 Stat. 3416 (1996), *codified in part at* 15 U.S.C. § 77r(a)(2)(A), Congress preempted any state-law claim that purported, indirectly or directly, to "impos[e] requirements on the contents of prospectuses or other offering documents" in a

Plaintiffs also contend that demand should be excused because the Director Defendants allegedly engaged in insider trading.  Compl. ¶ 86(a), (c)-(d).  But the Court previously rejected claims that three of the eight Director Defendants faced a substantial risk of liability for alleged insider trading.  The plaintiffs in the other derivative cases alleged that three Directors "'sold stock in the IPO on the basis of [material, non-public] information,' namely Facebook's mid-quarter internal revenue projections."  *Id.* at \*18 (quoting derivative complaints).  The Court found that such information could not give rise to an insider trading claim because "'Delaware courts … have been reluctant to require disclosure of information that does not bear reliably on firm value, particularly soft information such as projections of performance or estimates of value.'"  *Id.* at \*19 (quoting *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 938 n.149 (Del. Ch. 2004)).  The Court further held that, "even if internal projections could be considered material to the IPO, Derivative Plaintiffs have not demonstrated that the Facebook projections would have 'significantly altered the total mix of information in the marketplace,'" considering that Facebook "repeatedly made express and extensive warnings … about the trend of increased use of mobile applications."  *Id.* (quoting *In re Oracle*, 867 A.2d at 934).[11]  Finally, the Court

---

national securities offering such as Facebook's IPO.  H.R. Conf. Rep. 104–864, at 40 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3920, 3921; *see also Myers v. Merrill Lynch & Co.*, 1999 WL 696082, at \*8 (N.D. Cal. Aug. 23, 1999) ("the purpose of the NSMIA is to designate the federal government as the exclusive regulator of national offerings of securities"), *aff'd*, 249 F.3d 1087 (9th Cir. 2001).

[11]  In addition, by May 9 and 10—before the three Facebook Directors sold—the media had already widely reported both Facebook's past and ongoing mobile challenges, and that Facebook had told analysts that it did not expect to meet its most optimistic projections.  *See* Class Dismissal Motion at 12-14, 40-45.  Delaware's materiality standard follows the federal standard.  *See Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) (federal "materiality standard has been a mainstay of Delaware law for decades."); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) ("[I]t is clear from the Delaware cases that the materiality standard of *TSC Industries* ... applies.").

held that the fact that certain "Directors sold their stock in the IPO" did not raise an "'inference of fraud' as '[e]arly investors and promoters routinely sell stock in IPOs.'" *Id.* at *20 (quoting *In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at *7 (S.D.N.Y. July 10, 2006)).

Plaintiffs here again allege that the same three Directors sold stock in the IPO based on Facebook's internal revenue projections.  Compl. ¶ 86(c); *id.* ¶ 92 (Directors traded on "material, non-public information," specifically, "Facebook's revised estimates for the second quarter and the full year of 2012"); *id.* ¶ 94 (same).  Plaintiffs again assert that the sale of stock in the IPO by these Directors supports an inference of fraudulent intent.  *See id.* ¶¶ 91, 94-95.  Plaintiffs' claims fail for the same reasons stated in the Derivative Opinion.

### 2. Plaintiffs Have Not Adequately Alleged That A Majority Of The Directors Lack Independence.

This Court previously held that the other derivative plaintiffs failed to adequately allege that a majority of Facebook's Board lacked independence to consider a demand.  Derivative Op. at *23.  The other derivative plaintiffs, like Plaintiffs here, relied heavily on "the fact that Zuckerberg controls over half of Facebook's voting shares and thus purportedly determines the composition of the Board."  *Id.* at *20; *see also* Compl. ¶ 86(e).  This Court held that such allegations do not demonstrate demand futility, noting that "the Delaware Supreme Court has repeatedly held that 'even proof of majority of ownership of a company does not strip the directors of the presumption of independence.'"  Derivative Op. at *20 (quoting *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984)); *see also Beam v. Stewart*, 845 A.2d 1040, 1054 (Del. 2004) ("A stockholder's control of a corporation does not excuse presuit demand on the board....").[12]  And, as here, the other derivative plaintiffs sought to "bolster their allegations by

---

[12]   The Court noted that it need not even consider whether the Board is controlled by Mr. Zuckerberg because the plaintiffs failed to "allege[] facts with specificity suggesting that

noting that members of the Board have had past business dealings with Zuckerberg and the Company." Derivative Op. at *21; *see also* Compl. ¶ 86(f) ("The Director Defendants' lack of disinterestedness and independence is also supported by business relationships, financial and personal ties and other factors."). The Court rejected these allegations as well, noting that "'[m]ere allegations that [directors] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes.'" Derivative Op. at *21 (quoting *Beam*, 845 A.2d at 1051-52). Instead, "'a plaintiff must plead facts that would support the inference that because of the nature of a relationship or additional circumstance other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director.'" *Id.* (quoting *Beam*, 845 A.2d at 1052). There were no such allegations in the other derivative complaints and there are none in this Complaint.

The Court then considered and rejected the remaining demand futility allegations including that (1) Director "Andreessen felt 'a sense of owingness' to Zuckerberg because Andreessen's venture capital firm made money on Facebook's acquisition of Instagram"; (2) Director "Bowles is conflicted because he sits on the board of Morgan Stanley"; and (3) Directors "Graham and Hastings are not independent directors because they serve as CEOs of The Washington Post and Netflix respectively, which are 'major advertiser[s]' with Facebook." *Id.* at *21-22. Plaintiffs here rely on the same rejected allegations. *See* Compl. ¶ 86(f)(vi) (noting that Director Andreessen's firm profited from the Instagram deal); *id.* ¶ 86(f)(i) (alleging that Director Bowles has "conflicting fiduciary duties" because he "is a director of Morgan

---

[Mr. Zuckerberg] personally engaged in any wrongdoing that would render him 'interested' for the purposes of this lawsuit." Derivative Op. at *20. Plaintiffs' Complaint here similarly fails to allege any facts suggesting that Mr. Zuckerberg engaged in any wrongdoing.

Stanley"); *id.* ¶ 86(f)(iii)-(iv) (noting that Directors Graham and Hastings are CEOs of The Washington Post and Netflix respectively, which are "significant advertiser[s] on Facebook").

Plaintiffs also attempt to plead demand futility by alleging that certain Directors "personally profited" from the IPO and thus are unable to independently consider a demand. Compl. ¶ 86(a); s*ee also id.* ¶¶ 13, 17-28.  But such allegations are legally insufficient.  As this Court noted in rejecting similar allegations, the mere fact that some Directors sold shares in the IPO does not render them incapable of independently assessing a demand.  *See* Derivative Op. at *20-21 (noting that "[e]arly investors and promoters routinely sell stock in IPOs") (internal quotations omitted).  If such sales were sufficient to plead demand futility, demand would be excused in every derivative suit alleging wrongdoing related to an IPO.  *See Aronson*, 473 A.2d at 818 (noting that the argument that demand is excused based on mere allegations of director misconduct "would effectively abrogate Rule 23.1 and weaken the managerial power of directors").  Instead, Plaintiffs must plausibly allege that the Director sales were *improper* in some specific way.  The Court previously rejected a similar claim that certain Directors' sale of stock in the IPO was improper.  Derivative Op. at *18-20 (holding that the Directors did not face a substantial risk of liability for selling shares in the IPO).  And, to the extent Plaintiffs vaguely allege that the profits realized by Directors who sold stock in the IPO made them dependent on Mr. Zuckerberg, *see* Compl. ¶¶ 86-87, such allegations fail because Plaintiffs do not explain how having profited from the IPO in the past makes the Board dependent on Mr. Zuckerberg in the future.  *See* Derivative Op. at *21 (rejecting claim that Directors were dependent on Mr. Zuckerberg based on "past business dealings with Zuckerberg and the Company"); *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *9 (Del. Ch. Oct. 12, 2011)

(past financial benefits are insufficient to show dependence without particular allegation showing how the director's "decision-making was altered").[13]

Nor do Plaintiffs fare any better with their allegations that Director Sandberg lacks independence because she "is a subordinate officer who is not in a position to challenge the insider trading of the Selling Directors." Compl ¶ 86(b). This allegation is inconsistent with Delaware's presumption of directorial independence: "Delaware law does not assume that directors have a self-interest in preserving their positions." *RCM Secs. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1330 (2d Cir. 1991). Indeed, if a plaintiff could establish a lack of independence simply by noting that a director is a "subordinate officer," virtually all inside directors would presumptively lack independence. *See In re Sagent Tech., Inc. Derivative Litig.*, 278 F. Supp. 2d 1079, 1089 (N.D. Cal. 2003) ("[D]emand futility cannot be pled merely on the basis of allegations that directors acted or would act to preserve their positions. If these allegations were sufficient to show lack of independence, every inside director would be disabled from considering a pre-suit demand.")(internal citation omitted). In any event, Plaintiffs have failed to

---

[13]   Plaintiffs likewise insist that "demand is … excused because there is a reasonable doubt that the IPO was the product of a valid business judgment." Compl. ¶ 87. But, as this Court has already held, the business judgment rule is irrelevant to demand where the alleged "loss eventuates not from a board's decision but rather from considered inaction." Derivative Op. at *18. Here, Plaintiffs do not challenge the decision to have an IPO or to allow individual directors to sell their shares in the IPO; instead, they challenge the Board's alleged considered inaction in "*permit[ing]* the IPO to proceed despite knowledge of the deliberate scheme to have revised revenue and earnings figures provided to some investors and not others." Compl. ¶ 87 (emphasis added); *see also In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 596-98 (S.D.N.Y. 2007) (applying *Rales* test where plaintiffs accused the board of insider trading and   "caus[ing] the Company to improperly misrepresent [its] financial prospects"). In any event, Plaintiffs are unable to rebut the business judgment rule's presumption that any Board decisions related to the IPO were "taken honestly and in good faith," *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 824 (Del. Ch. 2005), especially given the Court's prior ruling that "internal calculations and projections are not material facts that are require[d] to be disclosed in a registration statement," Derivative Op. at *23 (internal quotations omitted).

allege particularized facts suggesting that Sandberg is controlled by Zuckerberg. *See, e.g.*, *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988) (demand not futile where plaintiffs failed to "plead any facts tending to show that the … directors' positions were actually threatened by" the alleged controlling person), *overruled on other grounds*, 746 A.2d 244 (Del. 2000).

Even if Plaintiffs had adequately pleaded that Director Sandberg lacked independence, this would have no legal significance because this Court has already held that the rest of Facebook's Board of Directors could have adequately and impartially considered a shareholder demand. *See* Derivative Op. at *18-23; *see also, e.g.*, *id.* at *20 (rejecting allegations that Directors Zuckerberg, Breyer, and Thiel faced a substantial threat of personal liability due to their selling stock in the IPO because "such sales raise no inference of fraud as early investors and promoters routinely sell stock in IPOs") (internal quotation marks and brackets omitted); *id.* ("Derivative Plaintiffs also allege that the Board is dominated and controlled by Zuckerberg, but have not alleged facts with specificity suggesting that he personally engaged in any wrongdoing that would render him 'interested' for the purposes of this lawsuit."); *id.* at *22 ("There are no facts alleged to suggest that Bowles, Graham, or Hastings would risk their reputations and careers to protect their respective companies' relationship with Facebook …."); *id.* at *23 (rejecting as conclusory "allegations that Defendants Andreessen, Bowles, and Thiel, as members of the Audit Committee, face a substantial likelihood of personal liability for the issuance of Facebook's Registration Statement") (internal quotation marks omitted).   The addition of Director Sandberg to Facebook's Board does not change the fact that Plaintiffs have "failed to rebut the presumption" of director independence. Derivative Op. at *23.  Just as with the earlier derivative plaintiffs, this failure means that the *Jones* Plaintiffs have not shown that demand should be excused and therefore they lack derivative standing.

**B.      Plaintiffs' Failure To Own Their Shares At The Time Of The Alleged Wrongdoing Requires Dismissal.**

Plaintiffs also lack standing—and cannot establish that there is a "lawsuit over which to exercise jurisdiction," *Potter v. Hughes*, 546 F.3d 1051, 1055 (9th Cir. 2008)—because they have not adequately alleged that they were Facebook shareholders at the time of the alleged wrongdoing.  *See* 8 Del. C. § 327 (requiring derivative complaint to aver that plaintiff was "a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law"); Fed. R. Civ. P. 23.1(b)(1) (requiring a derivative plaintiff to allege that he "was a shareholder or member at the time of the transaction complained of").  This Court has previously held that individuals who challenge pre-IPO conduct but who did not become owners of Facebook stock before the IPO do not satisfy this "contemporaneous ownership" requirement because "the alleged wrongs occurred prior to the acquisition of their shares."  Derivative Op. at *16.  That holding applies here:  Plaintiffs allege misconduct that took place before the IPO, *see, e.g.*, Compl. ¶ 4 (describing discussions with the underwriters regarding revised internal revenue projections), but they fail to adequately allege that they owned Facebook stock prior to the IPO.

In their Complaint, Plaintiffs offer the conclusory legal allegation that they were Facebook "stockholder[s]" prior to the IPO.  Compl. ¶ 15.  This is insufficient.  *See Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) ("We are not … 'bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions.'") (citation omitted).  Plaintiff Jones further alleges that she "held Facebook shares continuously since February 15, 2012," Compl. ¶ 15, and Plaintiff McConnaughey alleges that she held Facebook shares continuously since March 14, 2012, *see* McConnaughey Compl. ¶ 15.  These vague allegations about holding shares likewise are insufficient and do not satisfy Plaintiffs' burden to

"plead *specific facts* showing continuous and contemporaneous share ownership."  Derivative Op. at *14 n.17 (emphasis added) (citing, *inter alia*, *In re Accuray, Inc. S'holder Derivative Litig.*, 757 F. Supp. 2d 919, 926 (N.D. Cal. 2010) ("Plaintiffs generally allege that they were shareholders of 'Accuray at the time of the continuing wrongs complained of herein.'  This vague allegation does not satisfy the strict standard of Rule 23.1")).

Facebook, in fact, has no record of either Plaintiff Jones or Plaintiff McConnaughey being a shareholder at any time between February 15 and May 18, 2012.  *See* 4/26/13 Letter from L. Brenten to J. Cascio (Cascio Decl. Ex. F) ("[N]either Gaye Jones nor Holly McConnaughey was a shareholder of record on February 15, 2012, March 14, 2012, or May 18, 2012.").   Despite this, Plaintiffs' counsel repeatedly told this Court that "Plaintiffs . . . both owned shares *in Facebook prior to its IPO*."   4/26/13 Rudman Ltr. at 3 (emphasis added) (Cascio Decl. Ex. G).  At a status conference on May 1, 2013, Plaintiffs' counsel urged the Court to allow motion practice in this case to proceed ahead of the agreed schedule for all of the other derivative actions pending before this Court and represented that "[t]he key difference" between this case and the other derivative cases was that Plaintiffs had "sufficient proof to show that [Plaintiffs] purchased *Facebook stock* in the secondary market many months prior to the events that took place in this case."  5/1/2013 Hr'g Tr. at 3 (emphasis added).

That representation was incorrect.  Weeks after the status conference, Plaintiffs' counsel produced "materials obtained from [Plaintiffs]" showing that Plaintiffs did not own "direct legal title" to Facebook shares prior to the IPO.  5/23/13 Rudman Ltr. at 1(Cascio Decl. Ex. A).[14]

---

[14]   Defendants refer to materials outside the Complaint in order to rebut Plaintiffs' representations to this Court that they had purchased Facebook stock prior to the IPO.  These materials underscore the inadequacy of Plaintiffs' imprecise and conclusory allegations that they were "stockholder[s]" and "held Facebook shares" prior to the IPO.  Compl. ¶ 15.

These new materials confirm that Plaintiffs only "held" units in a private investment fund prior to the IPO.  Specifically, on February 15, 2012 and March 14, 2012, Plaintiffs participated in auctions held by SharesPost Financial Corporation ("SharesPost") and purchased units (along with multiple other investors) in SharesPost investment funds that in turn held Facebook shares. *See* 5/23/13 Rudman Ltr. at 1 (Cascio Decl. Ex. A); 10-11/12 McConnaughey SharesPost Brokerage Account Summaries (Cascio Decl. Ex. H); 10-11/12 Jones SharesPost Brokerage Account Summaries (Cascio Decl Ex. I).   Notably, SharesPost informed subscribers like Plaintiffs that they would *not* hold shares of Facebook stock until *after* the IPO: "Members who have purchased units in special purpose investment vehicles through a SharesPost auction *are distributed shares following the IPO*."  SharesPost Media FAQ: 2012, at 4 (Cascio Decl. Ex. J) (emphasis added); *see also* SharesPost Email to Subscribers ("auction is for units of an investment vehicle designated to hold shares of Facebook, Inc. ('Facebook')," not for Facebook stock) (Cascio Decl. Ex. K).  The incomplete account statements that Plaintiffs produced confirm that SharesPost distributed "Facebook Inc. CL A" stock to Plaintiffs only on November 16, 2012, **six months after the IPO**, in exchange for units in the SharesPost fund.  *See* 10-11/13 McConnaughey SharesPost Brokerage Account Summaries (Cascio Decl. Ex. H); 10-11/12 Jones SharesPost Brokerage Account Summaries (Cascio Decl Ex. I).   Before that date,

---

Plaintiffs have likewise admitted to the Court that they purchased only an interest in SharesPost before the IPO, not Facebook stock.  6/6/13 S. Rudman Ltr. to Hon. Sweet (Cascio Decl. Ex. L)  In any event, the rule of continuous and contemporaneous share ownership is a question of standing.  *See In re Bank of N.Y. Derivative Litig.*, 320 F.3d at 293 ("[I]n order to have standing to bring a shareholder derivative action, a plaintiff must have owned stock in the company at the time of the alleged wrongdoing.").  And to determine whether or not Plaintiffs have standing, "the Court is not confined to the four corners of the Complaint."  *E. Paralyzed Veterans Ass'n, Inc. v. Lazarus-Burman Assocs.*, 133 F. Supp. 2d 203, 208 (E.D.N.Y. 2001); *see also Kolancian v. Snowden*, 532 F. Supp. 2d 260, 262 (D. Mass. 2008) (looking outside the pleadings on motion to dismiss for lack of derivative standing for failure of contemporaneous shareownership).

Plaintiffs' account statements show that Plaintiffs held units in a SharesPost fund and did *not* hold shares of Facebook stock.  The SharesPost investment fund thus remained the owner of the Facebook shares until six months after the IPO, not Plaintiffs.

Prospective stockholders, however, are not "'stockholders' for standing purposes." *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 407 (7th Cir. 2000) (interpreting 8 Del. § 327); *see also Harff v. Kerkorian*, 324 A.2d 215, 220 (Del. Ch. 1974) (contractual rights to acquire stock are inadequate to establish contemporaneous ownership under 8 Del. C. § 327), *aff'd in relevant part, rev'd in part on other grounds*, 347 A.2d 133 (Del. 1975).  Facebook had no fiduciary obligations to Plaintiffs as stockholders before they came "into actual possession of stock, regardless of how certain the stockholder's future ownership was when the challenged transaction took place."  *Montgomery*, 231 F.3d at 407.  Whatever their rights to acquire Facebook stock in the future, those "rights [were] wholly contractual.  As stated by [Justice Holmes,] [a plaintiff] 'does not become a stockholder, by his contract, in equity any more than at law.'"  *Helvering v. Sw. Consol. Corp.*, 315 U.S. 194, 200-01 (1942) (quoting *Parkinson v. West End St. Ry.*, 53 N.E. 891, 892 (Mass. 1899) (Holmes, J.)).[15]

---

[15]   Moreover, allowing Plaintiffs to bring a derivative suit in these circumstances would be tantamount to allowing them to bring a so-called "double-derivative" suit—that is, a suit where "the shareholders of a parent corporation or holding company" attempt to maintain a derivative action "on behalf of a subsidiary company," *Sternberg v. O'Neil*, 550 A.2d 1105, 1107 n.1 (Del. 1988).  It is, however, well established that a plaintiff may only bring a double-derivative suit where she holds stock in an entity that has a dominant and controlling interest in the nominal defendant corporation.  *See Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1080 (Del. 2011) ("[T]he underlying basis for double derivative standing is the parent's ability to enforce the subsidiary's claim by the direct exercise of the parent's 100 percent control of the subsidiary.") (internal quotations and brackets omitted).  Plainly the SharesPost fund—the entity in which Plaintiffs had a direct interest—did not have a dominant and controlling interest in Facebook.  *See, e.g.*, Facebook's May 16, 2012 S-1 Registration Statement, at 142 (listing principal Facebook stockholders before IPO).  Plaintiffs' ownership of shares of a SharesPost fund prior to the

Even assuming that Plaintiffs in theory could have standing based on a pre-IPO contract with SharesPost, the Complaint neither pleads the terms of nor appends any such contract.  A plaintiff fails to adequately allege contractual rights when it neither alleges nor appends the pertinent contractual terms.  *See Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (collecting cases).  Plaintiffs' Complaint does not even mention SharesPost or any contract.

Plaintiffs' suggestion that their SharesPost investment confers standing defies common sense because it treats the receipt of Facebook shares *after* the IPO as if it were actual ownership of those shares *before* the IPO.  Plaintiffs' argument is also belied by SharesPost's efforts to specifically structure its sale of membership units *not* to result in any pre-IPO transfer of Facebook shares in order to comply with federal securities laws that restrict the manner in which unregistered securities, such as shares of a private company like Facebook before the IPO, can be transferred.  *See* 15 U.S.C. § 77e; *see also SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) ("Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, prohibits any person from offering or selling a security in interstate commerce unless it is registered."), *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008).  Among other things, SharesPost delayed distribution of shares until a "liquidity event for the shares, such as a public offering or an acquisition," after which point such federal restrictions no longer applied.  *See* Cascio Decl. Ex. J at 3.  Moreover, "the form of purchase agreement on the SharesPost platform includes a provision making the contract subject to the prior observance of any applicable right of first

---

IPO therefore does not make Plaintiffs "stockholder[s]" of Facebook who may bring a derivative action on Facebook's behalf.  *See Sagarra Inversiones*, 34 A.3d at 1079; *Pessin v. Chris-Craft Indus., Inc.*, 586 N.Y.S.2d 584, 588 (1992) ("It is axiomatic that a double derivative action may not be maintained by a shareholder of one corporation that merely owns stock in the allegedly wronged corporation where the first does not control the second.").

refusal. . . ." SharesPost, A SharesPost Primer on Secondary Market Securities Law, *available at* https://welcome.sharespost.com ("SharesPost Primer") at 7 (Cascio Decl. Ex. M).  Before the IPO, absent a waiver from Facebook, Facebook had a right of first refusal ("ROFR") under its bylaws before any proposed transfer of its shares.  *See* Facebook Bylaws, art. 8.15(a) ("Before any Shares held by a Stockholder may be sold or otherwise transferred (including transfer by gift or operation of law), the corporation or its assignee(s) shall have a right of first refusal to purchase the Shares . . . .") (Cascio Decl. Ex. N).  In contrast, transfer without a ROFR was permitted after a public offering.  (*Id.*, art. 8.16(a).)   In other words, but for the very IPO Plaintiffs now complain about, they would have no right to their Facebook shares at all, and they certainly lacked any rights conferred by those shares until the shares were transferred to Plaintiffs in November of 2012, almost six months after the IPO. Before that transfer, any rights conferred by the shares rested with the SharesPost funds, not with Plaintiffs.

Nor can Plaintiffs get around the fact that they were not stockholders before the IPO by arguing that their Facebook stock allegedly "devolved [to] plaintiff[s] by operation of law" after the IPO.  5/23/13 Rudman Ltr. at 1 (Cascio Decl. Ex. A); *see also* 8 Del. C. § 327.  The "operation of law" provision is a "narrow exception to the contemporaneous ownership rule," and the "acquisition of . . . shares through contracts . . . does not qualify."  *Parfi Holding AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 937 (Del. Ch. 2008); *compare Chan v. Louis*, 303 A.D.2d 151, 152 (N.Y. App. Div. 2003) (plaintiff administratrix who was also 50% beneficiary of husband's estate, could bring derivative suit against company in which her late husband owned shares).  Plaintiffs did not allege in their Complaint that stock ownership devolved by operation of law, and they offer no facts to support their belated attempt to establish standing in that way.

### C.     The Complaints Should Be Dismissed As Unripe.

Another reason this Court dismissed the other derivative suits is that they were "predicated on the resolution of other litigation."  Derivative Op. at *25.  So too here.  Plaintiffs' Complaint here alleges that the Directors "exposed Facebook to billions of dollars in liability for violations of the federal securities laws, as the company is now the target of numerous securities class actions."  Compl. ¶ 11.  Plaintiffs "seek[] to recover … all amounts for which Facebook is liable … in the event the Company is found liable in the federal securities class action litigation…."  *Id.* ¶ 14.  But any liability for those alleged federal securities law violations has yet to be established, and damages (if any) have yet to be determined.  The damages Plaintiff seeks are "unrecoverable" at this time and "contingent 'on the outcome of a class action suit in which no judgment had been entered or settlement reached.'"  Derivative Op. at *25 (quoting *In re Cray Inc.*, 431 F. Supp. 2d 1114, 1133 (W.D. Wash. 2006), and citing *In re United Telecomms., Inc., Secs. Litig.*, 1993 WL 100202, at *3 (D. Kan. Mar. 4, 1993) ("Where, as here, the claim of damages is contingent on the outcome of a separate, pending lawsuit, the [derivative] claim is not ripe and the complaint must be dismissed."); *Falkenberg v. Baldwin*, 1977 WL 1025, at *4 (S.D.N.Y. June 13, 1977) (derivative claim stemming from costs associated with other litigation against company unripe because merits had yet to be determined)).

Plaintiffs' allegations of insider trading are not new and do not solve their ripeness problem or distinguish the Derivative Opinion.  The other derivative plaintiffs made identical allegations, *see Levy* Compl. ¶¶ 81-84; *Cole* Compl. ¶¶ 55-62; *Hubuschman* Compl. ¶¶ 55-62, but the Court dismissed their claims on ripeness grounds.  Derivative Op. at *25.  Plaintiffs' insider trading claims are contingent on the same faulty allegations that Facebook had an alleged duty to disclose its allegedly material internal revenue projections.  Compl. ¶ 86(c); *id.* ¶ 100

(tying insider trading claim to claim that "Facebook … complete[d] the IPO without making the required disclosures"); *id.* ¶ 66 (tying insider trading claim to premise that revision in revenue estimates "was required to be disclosed in the Registration Statement but was not").

## III.   PLAINTIFFS ARE INADEQUATE REPRESENTATIVES UNDER RULE 23.1.

There is a fourth threshold ground, if the Court chooses to reach it, that also bars the claims of the *Jones* Plaintiffs:  They do not "fairly and adequately represent the interests of shareholders" under Rule 23.1(a) because their counsel represented plaintiffs in IPO-based securities actions *against* Facebook but now purport to bring claims derivatively *on behalf of* Facebook.  *See Jones* Remand Mot. at 14 (conceding that Facebook is "the real party in interest" in the derivative cases).  Indeed, they now claim as an injury to Facebook the costs and damages in class action litigation that their own counsel instigated.  *See* Compl. ¶ 14, Prayer for Relief (f). This is grounds for dismissal under Rule 23.1.  *See, e.g.*, *Wall Street Sys., Inc. v. Lemence*, 2005 WL 292744, at *3 (S.D.N.Y. Feb. 8, 2005) (dismissing complaint where plaintiff "failed to show that he can fairly and adequately represent the interests of all shareholders, as required under Rule 23.1," because plaintiff brought both "a direct and derivative action").

Adequacy of representation is a threshold issue appropriately decided before remand. *See Potter*, 546 F.3d at 1055 ("[T]he satisfaction of the requirements of Rule 23.1 is a logical antecedent to federal jurisdictional questions.") (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)).  In assessing adequacy of representation, a court should consider both the plaintiffs and their chosen counsel.  *In re JPMorgan Chase & Co. S'holder Derivative Litig.*, 2008 WL 4298588, at *7-8 (S.D.N.Y. Sept. 19, 2008); *Stull v. Baker*, 410 F. Supp. 1326, 1336-37 (S.D.N.Y. 1976) (questioning "how an attorney can properly represent" both direct and derivative plaintiffs "without compromising his independence of professional judgment and

loyalty to these two groups of clients with potentially conflicting interests").

Here, Plaintiffs have chosen counsel who were already representing other plaintiffs in a related securities lawsuit *against* Facebook at the time they filed these derivative claims purportedly *for* Facebook.[16]  "Courts in this Circuit have long found that plaintiffs attempting to advance derivative and direct claims in the same action face an impermissible conflict of interest."  *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, 2006 WL 2849783, at *7 (S.D.N.Y. Oct. 4, 2006).  Such a conflict renders Plaintiffs "unfit to maintain the derivative claims." *Priestley v. Comrie*, 2007 WL 4208592, at *6 (S.D.N.Y. Nov. 27, 2007).  And Plaintiffs cannot cure this inadequacy merely by causing their attorneys to withdraw from the previous representation.  *See Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 209 (S.D.N.Y. 2009) ("[C]ounsel may not avoid a disqualifying conflict by dropping the less desirable client like a 'hot potato.'").  Accordingly, Plaintiffs' choice of counsel requires dismissal of their Complaint as it demonstrates Plaintiffs' inadequacy as shareholder representatives.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

---

[16]  Indeed, Plaintiffs' counsel, Robbins Geller Rudman and Dowd LLP, sought appointment as lead counsel in consolidated securities actions against Facebook.  *See Brian Roffe Profit Sharing Plan v. Facebook, Inc.*, No. 12-cv-4081 (S.D.N.Y.), Dkt. 45.  After losing its motion, Robbins Geller moved to withdraw from its representation of plaintiffs in the two securities actions that it had filed, but that motion was not granted until March 14, 2013.  *See Brian Roffe Profit Sharing Plan v. Facebook, Inc.*, 12-cv-4081 (S.D.N.Y.), Dkt. 96, 100; *Mamula v. Facebook, Inc.*, 12-cv-4362 (S.D.N.Y.), Dkt. 34, 37.  Before its motion was granted, and *while still representing the securities plaintiffs against Facebook*, on March 1, 2013, Robbins Geller filed the first of two identical putative derivative suits in the Delaware Court of Chancery *purportedly on Facebook's behalf*.  *See* Compl.; *Jones* Remand Mot. at 8 (conceding that Facebook is the "real party in interest" in the derivative litigation).

DATED:  June 7, 2013



/s/ *Andrew B. Clubok*

Susan E. Engel                                 Andrew B. Clubok (andrew.clubok@kirkland.com)
Joseph Cascio                                   Brant W. Bishop, P.C.
Kellen S. Dwyer                             KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS LLP           601 Lexington Avenue
655 Fifteenth St. NW              New York, NY 10022
Washington, DC 20005          Telephone: (212) 446-4800
Telephone: (202) 879-5000     Facsimile: (212) 446-4900
Facsimile: (202) 879-5200


Richard D. Bernstein             Tariq Mundiya
Elizabeth J. Bower               Todd G. Cosenza
WILLKIE FARR & GALLAGHER LLP   Sameer Advani
1875 K Street, NW                 WILLKIE FARR & GALLAGHER LLP
Washington, DC 20006          787 Seventh Avenue
Telephone: (202) 303-1000     New York, NY 10019-6099
Facsimile: (202) 303-2000      Telephone: (212) 728-8000
                                          Facsimile: (212) 728-8111

*Attorneys for Nominal Defendant Facebook, Inc.*